# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# PEORIA DIVISION

| | |
|---|---|
| TIMOTHY HERMAN, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Respondent. ) | Criminal Case No. 18-10032 <br> Civil Case No. 20-1358 |

## ORDER AND OPINION

Before the Court is Petitioner Timothy Herman's ("Petitioner") Motion to Vacate, Correct, or Set Aside Sentence under 28 U.S.C. § 2255. ECF No. 111.[1] For the reasons set forth below, Petitioner's § 2255 Motion is DENIED.

## BACKGROUND AND PROCEDURAL HISTORY

In June 2018, the Government filed a fourteen-count indictment against Petitioner. In short, the Indictment alleged that Petitioner engaged in a fraudulent scheme to defraud an individual out of more than $500,000 through false representations and had used mail and wire communications in furtherance of that scheme. The final count alleged that Petitioner lied to the Government. ECF No. 1. The Government later filed a Superseding Indictment to add additional charges related to another instance of a fraudulent scheme involving a business. ECF No. 23. Petitioner pleaded not guilty and ultimately agreed to waive his right to a jury trial, choosing instead to proceed with a bench trial. *See* d/e March 4, 2019.

---

[1] All citations are to Petitioner's criminal docket 18-10032.

On March 11, 2019, after Petitioner's bench trial, the Court entered an order finding Petitioner guilty of four counts of mail fraud, seven counts of wire fraud, three counts of interstate transportation of stolen property, and one count of making a false statement to the FBI. See d/e 03/11/2019; ECF No. 23. The Court acquitted Petitioner on one Count of Mail fraud, finding that the Government had not met its burden of proof. The Court sentenced Petitioner to 78 months imprisonment. ECF No. 93.

On October 8, 2020, Petitioner filed his initial Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255. ECF No. 111. In the instant § 2255 Petition, Petitioner claims that counsel's failure to call certain witnesses and to investigate the totality of circumstances amounted to ineffective representation. *Id*. Petitioner further faults counsel for not moving to sever the cases. *Id*. On February 10, 2021, the Government filed a response. ECF No. 119. On April 5, 2021, Petitioner filed a reply. ECF No. 121. This Opinion follows.

a. **Offense Conduct.**

The underlying facts involved Petitioner procuring loans for purported business plans while using the money to support his own lavish lifestyle, including taking vacations, preventing the foreclosure of his home, paying his ex-wife part of their marital settlement and paying off a personal guarantee he made on his daughter's mortgage. *See* ECF Nos. 84; 78 at 71–78. His scheme lasted from around 2013 until on or about December 2017 when he lied to federal law enforcement officers. *See* ECF No. 84 at 14.

i. **Theft from Augeo Direct**

Petitioner conducted business through several companies, including Delta Direct Connections, a call center in Bloomington, Illinois. ECF Nos. 84 at 5–6; 75 at 166. In 2012, Petitioner began discussions with Augeo Affinity Marketing about creating a customer rewards

program for the waste removal industry. In August of 2012, Augeo Affinity and Delta Direct formed a company named Augeo Direct to develop a waste removal customer loyalty program. ECF Nos. 84 at 6; 75 at 111–113. Augeo agreed that Petitioner, through Delta Direct, would oversee client relationships, operate a customer call center, and handle Augeo Direct's finances. ECF Nos. 84 at 6; 73 at 41–42.

In May of 2013, Augeo Direct entered into an agreement with Republic Services Procurement, Inc. ("Republic") to provide a customer rewards program. ECF Nos. 84 at 6; 77 at 55. This "Republic Deal" involved a payment to Augeo Direct based on the number of households enrolled in the program. As part of the deal, Republic deposited a fee of $300,000 into Augeo Direct's account to cap Republic's liability in the event that it failed to deliver households by the predetermined benchmark dates through December 21, 2015. ECF No. 77 at 61. Petitioner was ultimately in control of this deficiency fee because Delta Direct oversaw the finances of Augeo Direct. *Id*. at 63–64.

On June 1, 2013, Republic launched Augeo Direct's reward program in Fountain Hills, Arizona and shortly thereafter Republic deposited the $300,000 deficiency fee in Augeo Direct's account. *Id.* at 64. Petitioner and Augeo agreed that both parties could withdraw $50,000 from this deficiency fee. *Id* at 65. However, unbeknownst to Augeo, Petitioner began withdrawing additional funds from Augeo Direct in July 2013. By September 2013, three months after Republic had made the deficiency payment, Petitioner had withdrawn all of the remaining deficiency fee from Augeo Direct's account. ECF No. 84 at 7. In addition, Republic made monthly payments to Augeo Direct for enrolled households and Petitioner failed to give Augeo its share of these payments from October 2014 through March 2015. *Id*.; ECF No. 76 at 102.

Petitioner hid this from Augeo and by the time he finally admitted what he had done, he had taken more than $124,000 of Augeo's money. ECF No. 76 at 99. To mitigate the damage of Petitioner's theft, Augeo agree to treat the theft as a loan and agreed to forgive the loan in exchange for Petitioner's removal from the Augeo Direct business. *Id*. at 102–107.

### ii. Theft from D.S.

After Petitioner took the deficiency fee, he began obtaining funds from D.S., an elderly woman whose husband had recently passed away. ECF No. 84 at 8. D.S.'s husband had been a pastor and Petitioner assisted D.S.'s church by preaching and helping to hire a new pastor. *Id*.; ECF No. 77 at 10. A significant portion of D.S.'s money came from an asbestos related settlement due to her husband's illness. The testimony at trial indicates that Petitioner told D.S. that he could get her a better return on her money and described his role in the Republic Deal. ECF Nos. 84 at 8; 77 at 12–13. Petitioner even indicated that he expected a $17 million payout for his share of the Republic Deal within two years and would retire. ECF No. 77 at 13. D.S. told Petitioner that she did not want to invest in Augeo Direct, but she would loan him money for the business. *Id*. at 14–16. Between February and November 2014, D.S. loaned Petitioner hundreds of thousands of dollars. *Id*. at 16–25, 30–35.

In January 2014, Petitioner was having financial issues and on the same day he told his mortgage lender he could borrow money to stop an impending foreclosure, he executed a promissory note with D.S. for $200,000. ECF No. 84. After he received this money from D.S., he transferred $35,000 of D.S.'s money to his mortgage company to stop the foreclosure. *Id*. D.S. testified that she had no idea that any of her money was going towards Petitioner's personal debts or mortgages. ECF No. 84 at 126.

In early 2014, D.S. and Petitioner met often, and Petitioner told D.S. how great the Republic deal was progressing. ECF No. 84 at 26, 40–41. In May 2014, Petitioner insisted that he needed additional funds for the deal. *Id*. at 29. Again in September and October, Petitioner insisted that he needed additional money. *Id*. at 50. However, the business had relatively few expenses, and Petitioner spent the money for his own personal gain. ECF No. 84 at 27. In November 2014, Petitioner informed D.S. he could no longer make payments on her loans. ECF No. 77 at 52–53. Petitioner claimed that it was Republic who made the mistake but asserted that D.S. would get her money back. *Id*. In February, D.S. and her financial advisor met with Petitioner to discuss the loan, Petitioner again asserted that he would end up with millions of dollars and that D.S. needed to be patient to get her money back. *Id*. at 58. At one point, Petitioner told D.S. that he had made her a 10% beneficiary on a life insurance policy so that she would get her money back if anything happened to him. *Id*. at 59. According to D.S., for many months, Petitioner kept telling her that the Republic deal would work out, but he had not done any of the things he promised regarding the loan. *Id*. at 71. In August 2016, many months after he had stopped paying, Petitioner gave D.S. a four-thousand-dollar payment. *Id*. at 66. In early 2017, he offered to make a one-time payment of $2,500 and pay one-thousand dollars a month thereafter. *Id*. at 71–72. On November 12, 2016, he sent a $2,500 payment, which represented less than five percent of the $66,000 bonus he received around that time. ECF No. 84 at 12. D.S. testified that in January 2017, Petitioner promised that he would pay her $40,000 a year due to his new job, but she never saw that money. *Id*. at 94. The Government asserts that these efforts were merely an effort to continue to stave off action by D.S.

### iii. False Statements to Federal Law Enforcement

On December 29, 2017, agents from the FBI and United States Postal Inspection Service interviewed Petitioner. During that interview, Petitioner made a number of false and material statements. He claimed that he initially deposited the $200,000 in cash that D.S. gave him into her bank account, not his. *Id*. He further represented that the funds were used to keep his Direct Connections business alive and for payroll expenses when, in fact, Petitioner used the funds for personal expenses. *Id*. He also denied that he used D.S.'s money to pay his mortgage.

Petitioner's scheme to defraud Augeo and D.S. resulted in a loss of $658,945. *Id*. This amount includes credits for payments that Petitioner made back to D.S. *Id*.

## STANDARD OF REVIEW

Section 2255 provides that a prisoner "may move the court which imposed the sentence to vacate, set aside, or correct the sentence" on the basis that his sentence was imposed "in violation of the Constitution or laws of the United States . . ." 28 U.S.C. § 2255(a). If a petitioner is able to successfully assert a violation, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." § 2255(b). This is an extraordinary remedy because a petitioner seeking § 2255 relief has already "had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007).

Post-conviction relief under § 2255 "is appropriate only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (internal quotations and citation omitted). In deciding a § 2255 motion for post-conviction relief,

"evidence and inferences drawn from it are viewed in a light most favorable to the government." *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000).

A Section 2255 motion does not require an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001). Mere speculation does not warrant an evidentiary hearing, as the petitioner must file a detailed and specific affidavit showing "the petitioner has actual proof of his allegations beyond mere unsupported assertions." *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006). It is well-established that the affidavit is "a threshold requirement; its absence precludes the necessity of a hearing." *Id.*

## ANALYSIS

I.   **Ineffective Assistance of Counsel**

The right to counsel is the right to effective assistance of counsel. *Missouri v. Frye*, 566 U.S. 134, 138 (2012). To prevail on an ineffective assistance of counsel claim, a petitioner must show that: (1) "counsel's performance was deficient," and that (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the *Strickland* test requires both deficient performance and prejudice, an ineffective assistance of counsel claim can fail for lack of prejudice "without ever considering the question of counsel's actual performance," and vice versa. *United States v. Taylor*, 569 F.3d 742, 748 (7th Cir. 2009).

In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In order to establish deficient performance, "the petitioner must show 'that counsel's representation fell below an objective standard of reasonableness.'" *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland*,

466 U.S. at 688)). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011) (internal quotations and citation omitted). "Importantly, '[j]udicial scrutiny of counsel's performance must be highly deferential,' indulging a 'strong presumption' of effectiveness to combat 'the distorting effects of hindsight.'" *Atkins v. Zenk*, 667 F.3d 939, 944–45 (7th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

### A. Petitioner's Arguments Regarding Counsel's Alleged Deficiency

Petitioner contends his attorney, Joel E. Brown, should have conducted further investigation into particular aspects of the case, and called certain witnesses who allegedly would have corroborated Petitioner's explanation that he had a good faith belief in the future success of his business. Petitioner also faults Brown for failing to sufficiently question D.S., the victim of his fraud, to demonstrate that she was a savvier investor than the Government suggested.

According to Petitioner, Tim Owen, a banker that Petitioner was working with, would have testified about Petitioner's deposit of the initial $200,000 cash loan. Petitioner asserts that Owen would have testified that Petitioner paid off a lot of his debt. Petitioner further explains that Owen told the FBI that Petitioner met an elderly lady with huge amounts of money and that she wanted to give Petitioner even more money than he wanted. ECF No. 112-1 at 6. Petitioner continues that Owen "could have confirmed based on personal knowledge that [Petitioner] was able to pay all his renegotiated obligations to Kilhoffer, Buttita, Heartland Bank, and Seterus Mortgage." *Id*. at 13.

According to Petitioner, Brown should have also called Jon Vander Ark, an employee of Republic. Petitioner asserts that Vander Ark would have testified that in November 2014, they

were concerned about the Republic Deal, specifically about the number of household units coming in and the loss of exclusivity in January 2015. Petitioner argues that it was an email from Vander Ark that prompted him to have a conversation with D.S. about not being able to make the November payment. Things went south with the Republic Deal and at some point, Petitioner emailed Vander Ark to express aggravation about "having been dragged along for two years." *Id*. at 12. Petitioner argues this would have demonstrated that he had a good faith belief in the viability of the Republic Deal. *Id*.

Petitioner argues that Meredith Skarin, who was part of Republic, also could have described the timeline of the Republic Deal, corroborating Petitioner's argument that he reasonably believed in the financial viability of the agreement. Petitioner also faults Brown for failing to question the victim, D.S., regarding her experience with residential properties and another unsecured loan that D.S. made to her nephew that also went unpaid. The Court's understanding of Petitioner's argument is that he sought to undermine her testimony that Petitioner assured her there was no risk on the loan she was providing him since she had many investments and had previously lost money she had loaned. Thus, according to Petitioner she would have known there was risk involved with loaning Petitioner money.

Petitioner further claims that Brown should have called George Woods, his attorney who represented Petitioner in business and civil matters. ECF No. 112-1 at 20. Petitioner claims that George Wood would testify that he had a high opinion of Petitioner's integrity and would state that Petitioner had not sought any additional funds from D.S. when they met at Petitioner's office. ECF No. 112-1 at 20. Petitioner argues that Wood would state that Petitioner was focused on when and how he could pay back what he had borrowed

9

Petitioner argues that Brown could more effectively cross-examined certain witnesses, particularly Davis Kristal and Matt Healy. He argues that they could have explained the economic dynamic of the Republic Deal, presumably to again to corroborate Petitioner's story that he believed in the economic viability of his business plan. Petitioner argues that Brown failed to follow up on the information that Petitioner provided and refused to call the witnesses that Petitioner wanted to call.

Petitioner also faults Brown for failing to move to sever the trial so that he could have separate trials on the matters related to Augeo Direct and the loans from D.S.

**B. Counsel's trial decisions fell within the reasonable range of practice.**

The Government attached a detailed affidavit from Brown, along with a number of emails that took place between Petitioner and Brown during the course of their professional relationship. In the affidavit, Brown explains his reason for each of the issue Petitioner raises.

First, as to Petitioner's vague assertion that Brown failed to adequately investigate his claims, Brown notes the steps he took to investigate this case. Brown explains that he studied the discovery provided by the Government, spoke to potential witnesses, issued subpoenas, and took the deposition of a potential witness for use at trial. ECF No. 119-2 at 3. To the extent Brown did not further investigate certain facts, he explains that the line of investigation that Petitioner now suggests would not have furthered Petitioner's defense. As Brown explains, there was no doubt that Petitioner spent D.S.'s money on personal expenses. *Id*. at 5. His only defense was that he was permitted to loan himself that money. Any information about Petitioner's belief in his business would not have helped him prove that he was allowed to spend the money. Brown further explains that he did not call witnesses regarding the business deal with Republic because the defense theory was that the loans D.S. made to Defendant were personal loans and "Republic's conduct was

irrelevant." *Id.* Accordingly, Brown saw no advantage to calling Meredith Skarin or Jon Vander Ark. *Id*. Brown also observed that Republic had an attorney present at Petitioner's trial, making it unlikely that Skarin would have blamed Republic for Petitioner's woes as Petitioner now theorizes. *Id*. at 5.

Brown explains that he did speak to Petitioner's civil counsel, George Wood before trial but his recollection of the conversation differs from Petitioner's memory. Brown explains that Wood seemed reluctant to testify and that Wood did not recall the specifics of who said what during their meeting with D.S. *Id*. at 4. Brown also highlighted that Petitioner used Woods' services on many different transactions and that this could open up cross-examination opportunities for the Government. *Id*. Brown further argues Petitioner agreed with his recommendation about not calling Wood. *Id*. at 5. Regardless of Petitioner's agreement, Brown has articulated a compelling reason for declining to call Petitioner's lawyer and giving the Government the opportunity to cross examine this witness who would offer limited value to Petitioner.

As to requesting a severance, Brown argued that he believed it was unlikely the motion would have been granted due to the proximity and similarity of the two events. Counsel further explains that Petitioner believed that Augeo personnel thought well of him and agreed that the two cases should be tried together.

In examining counsel's conduct, courts are "highly deferential" to counsel and presume that the decisions constitute reasonable litigation strategy. *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005). Counsel's conduct is "strongly presumed" to have been within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or

11

adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id*. Here, Brown explains that he remained focused on Petitioner's defense and did not wish to be distracted by issues not relevant to Petitioner's ultimate guilt or innocence of the crimes. Brown further explains that he reasonably believed that it was unlikely a motion to sever the cases would be granted and that Petitioner wished to try the cases together because he believed that Augeo personnel thought well of him. Accordingly, the Court does not find Petitioner's attorney was ineffective or took unreasonable action in Petitioner's defense.

### C. Petitioner has not introduced any purported errors that would have undermined his conviction.

In addition to Brown's decision being reasonable, Petitioner has not introduced any purported errors or unintroduced evidence that undermine his convictions. It appears that Petitioner's primary purpose in asserting Brown should have called certain witnesses is that he wishes Brown had more aggressively argued that Petitioner was confident in the business deal he was pursuing with Republic. However, Petitioner does not point the Court to unintroduced evidence that suggests that Petitioner did not, in fact, misappropriate business loans for personal use. At bottom, Petitioner's argument is that the victims of his fraud would have been made whole without the fraud being discovered once the business was successful. However, that argument does not undermine his fraud conviction because Petitioner's fraudulent behavior involved lying to D.S. and taking money loaned to the business to stave off foreclosure of his home and support his lifestyle. He also lied to D.S. about his financial situation and refused to make sufficient payments on the loan even when he appeared to have the cash to do so. That he eventually expected to replace the stolen money does not undermine his fraud conviction.

Accordingly, Petitioner has not shown that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. See *Strickland v. Washington*, 466 U.S. at 694. Based on the foregoing, the Court finds that Brown's performance was not deficient and did not prejudice the defense.

**III.    Guilty Plea**

Petitioner claims that he could have avoided any jail time had Brown been candid about his chances at trial. Indeed, while simultaneously arguing that Brown's deficient performance resulted in a guilty verdict, Petitioner appears to admit that he did not have a valid defense to some of the claims.

To prevail on this issue a petitioner "must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 137 (2012). A petitioner must further show a reasonable probability exists that the plea "would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Id*. The second showing is of "particular importance because a defendant has no right to be offered a plea, nor a federal right that the judge accept it" *Frye*, 566 U.S. at 148–49 (quoting *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977), and *Santobello v. New York*, 404 U.S. 257, 262 (1971)).

Petitioner faults Brown for failing to advise him that he could offer full restitution based on an agreed percentage of his gross income and that restitution orders were subject to amendments based on changes in financial circumstances. ECF No. 112-1 at 21. Petitioner argues that if he had been advised he had a "zero chance" of sustaining a defense on the claims regarding Augeo Direct and that he could plead no contest to that charge in exchange for a dismissal of the other count for

a sentence of probation with an order for full restitution, Petitioner would have accepted the deal. *Id*.

Petitioner admits that he turned down the Government's initial offer that he pay D.S. $300,000 up front because he said he would not plead guilty to a felony that he did not commit and that he would lose his job. ECF No. 112-1 at 16. In response to the Government's offer, Petitioner told Brown he could pay $50,000 up front and $4,000 a month. Petitioner complained about the Government and said that he would "prefer to have the trial to clear my name." ECF No. 111-1 at 39. Brown warned Petitioner that his counteroffer regarding restitution payments would likely end the discussion of a plea agreement without a trial. *Id*. at 40. The record reflects that Brown worked diligently to secure a plea agreement and that Petitioner did not appear eager to find a resolution that would have avoided jail time. He instead stated that he preferred to go to trial and only offered to pay a relatively small portion of the amount of restitution owed to D.S. up front. He was also resistant generally to the idea of pleading guilty as he maintained he was innocent, construing the fraud as a business deal gone wrong. Further, it is not clear that the parties could have come to the agreement Petitioner now suggests since the Government had proposed a plea of guilty and a substantial amount of restitution up front and Plaintiff still suggests he would have wanted a deal where he avoided pleading guilty or paying a substantial amount of restitution at the outset.

The Court finds Petitioner has not established that counsel was deficient on this claim or that an acceptable guilty plea could have been negotiated.

**D. No evidentiary hearing is necessary.**

Evidentiary hearings are not required in § 2255 cases where there is no reason to suppose that a hearing would produce evidence justifying relief. *United v. Taglia*, 922 F.2d 413, 419 (7th

Cir. 1991). A hearing is only warranted if a petitioner alleges facts that, if proven, would entitle him to relief. *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir. 1995), but the Court may resolve the issues in a based on the record. *Oliver v. United States*, 961 F.2d 1339, 1343 (7th Cir. 1992). As explained above, Petitioner has not pleaded any facts justifying either a hearing or any relief.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing § 2255 proceedings requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." As such, the Court must determine whether to grant Petitioner a certificate of appealability under 28 U.S.C. § 2253(c)(2).

According to § 2253, a habeas petitioner will only be allowed to appeal issues for which a certificate of appealability has been granted." *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir. 2009). A petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *Id.* (citing 28 U.S.C. § 2253(c)). Under this standard, a petitioner must demonstrate that "reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For cases in which a district court denies a habeas claim on procedural grounds, the habeas court should issue a certificate of appealability only if the petitioner shows that (1) jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

Consistent with the discussion above, the Court does not find that Petitioner has made a substantial showing of the denial of a constitutional right. No claims raised before this Court have

15

presented issues debatable among reasonable jurists. Therefore, the Court declines to certify any issues for appeal pursuant to § 2253(c)(2).

## CONCLUSION

For the reasons stated above, Petitioner's [111] Motion to Vacate, Set Aside, or Correct Sentence under § 2255 is DENIED. The Court declines to issue a Certificate of Appealability. This case is now TERMINATED, and the Clerk of Court is instructed to close the civil case.

ENTERED this 26th day of May, 2021.

                                      /s/ Michael M. Mihm
                                          Michael M. Mihm
                                      United States District Judge